**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DIXON LAW,** *a Maryland limited liability company* <br><br> **and** <br><br> **ERIC DIXON,** *an individual* <br><br>     *Petitioners,* <br><br> **v.** <br><br> **ERIC POWELL,** *an individual,* <br><br> **and** <br><br> **RICHARD GRAY**, *an individual,* <br><br>     *Respondents*. | **Case No. 1:26-cv-01101-JEB** |

**PETITIONERS' OPPOSITION TO RESPONDENTS' PETITION TO CONFIRM AMENDED ARBITRATION AWARD AND REPLY IN SUPPORT OF THEIR FIRST AMENDED PETITION TO VACATE ARBITRATION AWARD**

Petitioners Dixon Law, LLC and Eric Dixon (collectively, "Dixon"), by and through undersigned counsel, hereby submit this Opposition to Respondents' Petition to Confirm Amended Arbitration Award and Reply in Support of their First Amended Petition to Vacate Amended Arbitration Award.

## I.    INTRODUCTION

Vacatur of the arbitrator's May 5, 2026 Final Amended Award, and all of the orders leading up to the Final Amended Award, is appropriate under D.C.'s Reformed Uniform Arbitration Act, D.C. Code §§ 16-4401 to -4432 (the "Act") for evident partiality by the arbitrator. For the same reasons, confirmation of the Amended Award, et al. is appropriately

337919383v.1

denied.

The arbitrator, Hon. Joan Feeney (ret.) and counsel for Respondents Eric Powell and Richard Gray's (collectively, "Powell") failed to disclose a relationship created during the pendency of the arbitration between Judge Feeney and Powell's chief expert witness, Hon. Bruce Markell. That relationship arose in November 2025, and culminated in both Judges agreeing to work on and, thereafter, co-signing an amicus brief filed with the U.S. Supreme Court. Judge Feeney's doing so is particularly egregious because she had yet had to issue a ruling on Powell's motion for attorney's fees – a motion that sought Judge Markell's fees – or enter a final award in the arbitration.

A "reasonable person would consider [the relationship] likely to affect the impartiality of" Judge Feeney. D.C. Code §16-4412(a). Indeed, at the inception of the relationship, Judge Markell raised the conflict with both Judge Feeney and Powell's counsel of record in this matter, Mr. Ito and Ms. Shambaugh. Judge Markell did not know that the arbitration was still ongoing and there were multiple issues yet to be decided, including Judge Markell's fees. He wrote, "[a]s far as I know, there has been no action to challenge the arbitration award, but we are probably still in the period during which it might be challenged." To Dixon's knowledge, Judge Feeney failed to respond Judge Markell's email, or if she did, neither Powell's counsel nor Judge Feeney has produced the response.

For his part, Mr. Ito told Judge Markell that he did not need to withdraw from participating in the amicus brief because "I don't think your participation on the amicus brief impacts Judge Feeney's award or the case moving forward." In so doing, Mr. Ito did not tell Judge Markell that Judge Feeney had yet to rule on the attorney's fee issue or make a final award. Mr. Ito also failed to advise JAMS or Powell of the new relationship.

By failing to make the disclosure, Judge Feeney violated D.C. Code §16-4412(a)(2). Sadly, Judge Feeney's failure to disclose the relationship was not an isolated incident, but rather a part of a larger, troubling pattern of behavior of exhibiting partiality in favor of Powell. The partiality took the form of downplaying her relationship with Judge Markell at the outset of the arbitration (for a different relationship); acknowledging, but disregarding, applicable law; making factual conclusions without supporting evidence; wholesale adoption of Judge Markell's opinions; and awarding compensatory damages and attorney's fees that were beyond excessive.

Understandably, Powell focus on the first relationship between Judge Feeney and Judge Markel, arguing that the disclosure was made, and that the Judges merely knew each other professionally, that they had no substantive discussions regarding the arbitration, and that the amicus brief ultimately filed before the Supreme Court addressed issues unrelated to the claims at issue in this proceeding. Powell's arguments miss the point.

Dixon does not seek vacatur because Judge Feeney and Professor Markell were professional acquaintances or did a seminar together. Nor do they contend that the amicus brief itself demonstrates actual bias. Instead, the issue is: whether Judge Feeney's contemporaneous participation in a Supreme Court amicus brief with Powell's expert witness during the pendency of the arbitration was required to be disclosed? If so, then her failure to do so warrants this Honorable Court exercising its sound discretion to vacate the amended award under the provisions of Section 16-4412.

## II.    FACTUAL BACKGROUND

The facts relevant to the current inquiry are straightforward and largely undisputed. This is a legal malpractice claim. The underlying representation is memorialized by two written retainers between the parties, dated April 4, 2022 and January 31, 2023, respectively. Retainer

3

letters collectively attached as Ex. 1. The scope of the representation was Powell's sale of an online men's clothing business known as Ratio, L.L.C., to an entity known as BLH Holdings, L.L.C.

The purchase price included a $100,000 payment to Powell, and two promissory notes issued to Messrs. Powell and Gray, respectively. Under the terms of the notes, Powell had a potential expectancy of up to $325,000. Of course, the future payments under the notes were dependent upon Ratio's financial performance. Alas on March 8, 2023, Ratio's new owners filed for Ratio's, as well as several related entities', bankruptcy protection in the United States Bankruptcy Court for the District of Delaware, Lead Case No. 23-10286-JTD. Thus, there were no payments made to Powell under the notes, either before or during Ratio's bankruptcy case.

As is true in most legal malpractice claims arising out of a business transaction, a salient issue was the value of what Powell lost, e.g., what they could have expected to collect upon if they had a perfected security interest in Ratio's assets. As is set forth below, despite Ratio having no assets, an ascribed value by the Bankruptcy Court of $200,000, and Powell presenting no facts or documents in the arbitration proving Ratio's post-transaction value, Judge Feeney accepted Powell and Judge Markell's valuation in her October 13, 2025 order on summary disposition and subsequent award, and in so doing awarded Powell compensatory damages of $758,544, prejudgment interest of $213,132.28, $554,000 in attorney's fees and $108,322.97 in expenses, including those for Judge Markell's expert services.

A.      Initiation of the Arbitration.

Pursuant to the retainer letters, the parties initiated an arbitration proceeding with JAMS on January 16, 2025. Thereafter, the parties agreed to the assignment of a retired U.S. Bankruptcy Judge, Hon. Joan Feeney, as arbitrator. On February 4, 2025, the Judge Feeney filed

4

her conflict disclosures. Disclosures, collectively attached hereto as Ex. 2. The disclosures did not identify Powell's expert witness, the Hon. Bruce Markell, himself a retired U.S. Bankruptcy Judge, and currently a law professor at Northwestern University.

B.      Initial Disclosures By Judge Feeney.

The initial telephone conference in this matter was held on March 27, 2025.  During that meeting, counsel of record discussed with Judge Feeney the various issues in the case, along with expected expert disclosures and testimony.  Powell's counsel, Peter Ito, advised Judge Feeney that Judge Markell was Powell's legal expert, and that Judge Markell had already prepared a multi-page written report opining on the issues of standard of care, breach, causation and damages.  Although there is no recording of that call, Dixon (whom were on the call) and their counsel recall that Judge Feeney responded to Judge Markell's involvement by noting that she may have crossed paths with Judge Markell at conferences.

As Dixon learned in January of 2026 (when Mr. Ito's office produced for the first time several selected documents) there were emails exchanged between Judge Feeney and Judge Markell during this time period. On April 1, 2025, an attorney sent an email to Judges Feeney and Markell asking whether they would participate in a "follow up" online seminar. In so doing, the attorney advised Judge Markell that "Joan [Feeney] is available after 4/8." *See* Emails, attached hereto as Ex. 3.

Based upon the substance of the attorney's initial email, however, it appears that Judge Feeney had yet to tell him about the arbitration or Judge Markell's involvement in the arbitration. Instead, Judge Feeney appears to have told the attorney that she was available after April 8th to conduct the seminar. Put differently, no more than four days after the March 27th meeting and Judge Feeney becoming aware of Judge Markell's retainer as Powell's expert witness in the

337919383v.1

arbitration, she apparently agreed to conduct the follow up seminar with Judge Markell, without any suggestion of a potential conflict in her doing so. *See* Ex. 3.

It appears that the only reason Judge Feeney was forced to confront the seminar and Judge Markell's participation in this arbitration was because Judge Markell, who knew that Judge Feeney was the arbitrator for this arbitration, responded to the attorney's email that same day (April 1st) by advising "[d]isclosure…such that if there is any hint or suggestion that my presence on a panel with her would affect the perception of impartiality [as arbitrator]" and as a result he was willing to sit out the follow-up seminar. *See* Ex. 2.

It was only after Judge Markell's email, that Judge Feeney addressed the ethical issues by responding:

> Dear Bruce and Eric, Just writing about this. Thank you for your email and the disclosure. I learned in a call last Thursday that you are an expert in one of my arbitrations. I made the disclosure that I know you from your time as a judge, and that we did the CLLA Red River program last year, and counsel for both parties did not have a problem with me continuing to be the arbitrator. I will make a supplemental disclosure and if they have an issue, I will withdraw as moderator. Thanks, Joan

*Id.*

Dixon and their legal counsel dispute that Judge Feeney made such a detailed disclosure during the March 27th meeting, or at any other time. Instead, it is their collective recollection that Judge Feeney downplayed the relationship between she and Judge Markell casually noting that the two may have crossed paths in the past at conferences. Moreover, to Dixon's knowledge, Judge Feeney never ran Judge Markell's name through JAMS' conflicts screen.

On April 2nd, Judge Feeney sent a follow up email that read:

> Dear Professor and Eric,

6

> I have given this some thought over the past day and I think it is best that I not ask the parties in my arbitration if they consent to my continuation of the case if Professor Markell and I do the webinar again. I do not want the parties or counsel to think I am putting any pressure on them. Therefore, I am going to ask you to find another moderator. I hope you understand, *but with these ethical dilemmas I always find that*….

*Id*. (emphasis added). The email is incomplete. Thus, Judge Feeney either prematurely sent her email and did not follow up, or the copy of the email string provided by Mr. Ito's office was cut off and is incomplete. In any event, Judge Feeney's statements are telling and establish that even she was concerned about how the parties would view the relationship and/or that it could create an ethical conflict or in her words ethical dilemma.

C.     The Conduct of the Arbitration Proceeding Through The November 4, 2025 Interim Award.

During the arbitration, Judge Feeney also made a number of procedural and substantive rulings that, from Dixon's perspective, reflected signs of bias and partiality.  For example, during a telephone conference to discuss a discovery schedule, Judge Feeney proposed a schedule that permitted Powell to depose Dixon, but would deny Dixon the ability to depose Powell.  It was not until Dixon's counsel pointed out how patently unreasonable such a discovery process would be that Judge Feeney relented, and permitted Dixon to take depositions.

Further, Powell's case relied almost exclusively on Judge Markell's written report and supplemental report. Judge Feeney likewise relied on and adopted the opinions of Judge Markell. For example, in her October 13, 2025 order granting Powell's motion for summary disposition, Judge Feeney completely adopted all statements and opinions of Judge Markell, while, at the same time, denigrating the opinions of Mr. Gold, Dixon's expert, in an unprofessional fashion. *See* Doc. 5-3, pp. 42-90.

7

On November 4, 2025, Judge Feeney entered her interim award. Doc. 5-3, pp. 90-122. Judge Feeney awarded Powell the full amount of their demand $758,544 in compensatory damages, plus prejudgment interest. *Id.* The staggering award was despite the fact that the record demonstrated that Powell presented no evidence proving Ratio's value post-sale or whether Powell could have collected any sums from Ratio pre-bankruptcy or from Ratio's bankruptcy estate. At the same time, the evidence adduced demonstrated that Ratio had no assets post-purchase, and that the Bankruptcy Court had ascribed a value to Ratio of $200,000 for the purposes of Ratio's and other entities' combined bankruptcy cases.

Distilled to its essence, Powell sold Ratio for the purchase price of $100,000 and a note. Ratio defaulted on the note less than a year later and then filed for bankruptcy. Powell and Judge Feeney's reasoning is that, despite its bankruptcy, Ratio had a value of at least $758,544, and if Powell had a secured lien, then they would have collected that amount from Ratio or its bankruptcy estate.

Judge Feeney's award was not supported by evidence, the law, or common sense. Its fallaciousness is revealed by analogy. Assume Powell sold a used car, and the buyer financed the purchase price via a promissory note held by Powell. The purchaser then demolished the car after the sale, and defaulted on the note. Powell's security interest in the car, (what they claim the malpractice caused them to lose), however, is only as valuable as the what the collateral is currently worth, which was a demolished car. Here, Judge Feeney concluded that despite going bankrupt, Ratio's value, as a demolished business, had not just gone up since Powell sold it, it had gone up so much that Ratio had liquidity/assets in excess of $758,544 – an amount which Powell not just could have, but would have, collected upon (a conclusion required as a matter of law in order to award damages).

8

D.      The Amicus Brief.

The day after the interim award, November 5, 2025, and unbeknownst to Dixon at the time, Professor David Kuney wrote to Judge Feeney asking her if she would like to co-author an amicus brief for an appeal pending before the U.S. Supreme Court. *See* Doc. 5-3, pp. 176-77. On November 6, 2025, Professor Kuney emailed Judge Markell inquiring if he too would like to co-author the amicus brief. *See* Doc. 5-4, pp. 3-4.

On November 17, 2025, both Judge Feeney and Judge Markell learned that the two were working on the amicus brief. Doc. 5-3, p. 177. Doc. 5-4, pp. 3-4. In response, Judge Markell wrote to Professor Kuney and Judge Feeney. Doc. 5-3, pp. 16-17. In his email, Judge Markell wrote, in part:

> Judge Feeney and David:
>
> I am being overcautious, but for purposes of conflict, I was recently an expert in an arbitration conducted by Judge Feeney. I did not give testimony at the hearing, but did submit two reports and a deposition.
>
> As far as I know, there has been no action to challenge the arbitration award, but we are probably still in the period during which it might be challenged.
>
> For the record, I have no problem with this, and I will check separately with counsel who hired me

*Id*.

Judge Markell then emailed attorneys Ito and Shambaugh. Doc. 5-4, pp. 3-4.  In the email, with a subject line of "Heads up," Judge Markell wrote: "Peter and Megan: Judge Feeney and I have been asked to join an amicus brief to the Supreme Court. The brief is in the draft stages. I will withdraw if you think our joining the same brief may impact your arbitration award." Nov. 17, 2025 emails, attached as Ex. 4.  Mr. Ito responded the next day as follows:

337919383v.1

> Hi Bruce,
>
> Good morning!
>
> Thanks for the head's up.
>
> No need for you to withdraw. I don't think your participation on the amicus brief impacts Judge Feeney's award or the case moving forward.
>
> Best regards

*Id*. Mr. Ito failed to advise Judge Markell (at least in the correspondence thus far revealed) that Judge Feeney still had multiple dispositive issues to decide in the arbitration, including whether to award Powell Judge Markell's expert fees.

Judge Feeney did not disclose the collaboration with Judge Markell to the parties. Neither did Mr. Ito. The amicus brief was filed with the Supreme Court on December 10, 2025.

E.      Powell's Motion for Attorney's Fees and Expenses.

On November 25, 2025, Powell filed their Motion for Attorney's Fees, Costs and Disbursements. Motion attached as Ex. 5. In addition, Powell filed a Motion for an Award of Prejudgment Interest on the compensatory damage award.

In their Motion for Attorney's Fees, et al., Powell acknowledged that their attorneys had time entries only totaling $221,545.00 and a signed contingency fee agreement providing for 40% of Powell's net recovery. Nevertheless, Powell asked Judge Feeney to disregard the foregoing and award them $624,499.31 in fees ($1,200 per hour worked) and $106,322.97 in additional costs (including Judge Markell's fees). *See* Ex. 5. Dixon opposed the Motion, noting that:

> [Powell] seek an extreme award of $624,499.31 in attorneys' fees based solely on a private contingency-fee agreement between [Powell] and their counsel, Ito Law Group ("Ito Law"). Under that agreement, the firm receives 40% of Claimants' "net recovery,"

10

which the agreement defines to include not only damages awarded but also any attorneys' fees awarded in arbitration. Claimants now ask the Arbitrator to adopt this private arrangement wholesale, including the double counted "40% of the recovery including the fee award" structure, rather than applying the lodestar analysis required under Colorado law. They present no lodestar calculation, no evidence of the prevailing market rate in Colorado, no expert testimony, and no analysis of reasonableness under Colorado Rule of Professional Conduct 1.5(a). They instead assert that the contingency percentage alone is "reasonable," and deem that sufficient.

*See* Dixon's Opp., attached as Ex. 6.

Judge Feeney then scheduled a conference call with the parties regarding Powell's Motion for Attorney's fees, et al. During the January 2, 2026 call, Judge Feeney asked Mr. Ito what constituted the $106,322.97 in costs. Mr. Ito advised Judge Feeney that a portion of the sum was for Judge Markell's fees. Judge Feeney once again failed to advise Dixon of her recent work with Judge Markell and, instead, requested that Mr. Ito send her the supporting documentation.

F.      Dixon Becomes Aware Of The Amicus Brief.

On December 31, 2025, undersigned counsel, still perplexed by Judge Feeney's animosity and rulings that seemingly disregarded the acknowledged applicable law, did an internet search of the Judges. One of the hits was for the amicus brief.

G.      Dixon Moves To Disqualify Judge Feeney.

On January 6, 2026, Dixon moved to disqualify Judge Feeney based upon her undisclosed involvement with Judge Markell on the amicus brief. *See* Motion to Disqualify, attached as Ex. 7.  In response, Powell opposed and produced, for the first time, multiple emails between Mr. Ito, Judge Markell and Judge Feeney. *See* Opposition, attached hereto as Ex. 8. To which, Dixon filed a reply. *See* Reply attached as Ex. 9.

337919383v.1

Unbeknownst to Dixon, Judge Feeney issued an affidavit. Doc. 5-3, pp. 175-178. JAMS did not produce the affidavit to Dixon. In addition, JAMS referred the issue to Richard Chernik for evaluation of Dixon's Motion to Disqualify. Again, JAMS did not advise Dixon of Mr. Chernik's involvement. *See* Ex. 7. To which, Dixon filed a reply. *See* Ex. 8.

On February 6, 2026, Mr. Chernik issued a two-page letter recommending that the Motion to Disqualify be denied because, according to him, "[t]here was no material contact between Feeney and Markell, and Feeney made robust disclosures about her relationship with Markell early in the case." Doc. 5-3, pp. 172-173. On February 27, 2026, JAMS adopted Mr. Chernik's recommendation. Doc. 5-3, p. 171.

H.    Amended Final Award.

As a result, Judge Feeney continued to preside over the arbitration. On May 27, 2026, Judge Feeney issued an Amended Award, granting Powell $758,554 in damages, $554,000 in attorneys' fees, $108,042.12 in costs and disbursements (including Judge Markell's fees), and $213,000 in prejudgment interest. Doc. 5-3, pp. 146-160.

## III.    ARGUMENT

A.  The Legal Standard(s) For Vacatur Under The Act.

There are two written retainers between Dixon and Powell (collectively attached hereto as Ex. 1). In both agreements, the parties agreed to submit to arbitration, and that the arbitration would be governed by D.C.'s Act. *See* Ex. 1. As a result, Dixon seek vacatur under D.C. Code § 16-4423(a)(2)(A), due to "evident partiality" by the arbitrator. In so doing, Dixon invoke the provisions of D.C. Code §16-4412.

Under D.C. Code § 16-4412(a), "a person who has been requested to serve as an arbitrator has the duty to conduct 'a reasonable inquiry' and then to disclose 'any known facts

12

that a reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding.'" *C.R. Calderon Constr., Inc. v. Grunley Constr. Co.*, 257 A.3d 1046, 1051 (D.C. 2021). An arbitrator is "required by the statute" to make two types of disclosures. *Id.*, at 1051-52. As is applicable in this case, one of the requisite disclosures occurs when there is "[a]n existing or past relationship with any of the parties to the agreement to arbitrate or the arbitration proceeding, their counsel or representatives, a witness, or other arbitrators." *Id.* (quoting § 16-4412 (a)(1)-(2)). Further, the "arbitrator has a continuing obligation to disclose…any facts that the arbitrator learns after accepting appointment which a reasonable person would consider likely to affect the impartiality of the arbitrator." *Id.* (b).

An arbitrator's failure to make the foregoing disclosure permits an appellate court, "in its discretion, to set aside the arbitration award." *Grunley*, at 1052 (citing § 16-4412 (d)). In addition, "[i]f an arbitrator discloses a fact required by subsection (a) or (b) of this section to be disclosed and a party timely objects to the appointment or continued service of the arbitrator based upon the fact disclosed, the objection may be a ground under §16-4423(a)(2) for vacating an award made by the arbitrator." D.C. Code § 16-4412(c). If evident partiality is established under the provisions of either paragraph (c) or (d), then "§ 16-4423(a)(2)(A) requires [a] court to vacate the arbitration award." *Grunley*, at 1052. Applying the foregoing standards, vacatur of the amended award is appropriate.

B.      Powell's Brief Incorrectly States The Proper Standard.

Rather than acknowledging that the Act applies to this appeal, Powell's Petition/Opposition incorrectly cites to the federal act in some places and the D.C. Act in other portions of their filing.  In so doing, Powell contends that the federal act is *in pari materia* with the Act.

13

While this may be true to an extent, that rule of statutory interpretation does not apply to Section 16-4412, because it has no federal counterpart. Thus, there is no federal statute, much less interpreting decisions or legislative history, to employ in interpreting § 16-4412. This is borne out by Powell's Petition/Brief not citing to a federal counterpart of Section 16-4412, and initially relying, exclusively, on the Supreme Court's decision in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S. Ct. 337, 21 L. Ed. 2d 301 (1968) and its progeny. *See* Doc 5, pp. 22-28.

After applying the standard enunciated by the U.S. Court of Appeals for District of Columbia Circuit's decision in *Republic of Argentina v. AWG*, 894 F. 3d 327 (D.C. Cir. 2018), only then does Powell begin to address the provisions of Section 16-4412. In so doing, Powell does not address or apply paragraphs (b), (c) or (d) of the statute, other than to acknowledge that the decision to vacate under paragraph (d) is left to the sound discretion of the Court.

C.   Judge Feeney Was Required To Disclose The Relationship.

"There is no doubt that the [Act]" required Judge Feeney to disclose to the parties her involvement with Judge Markell in preparing and signing the amicus brief. *Grunley*, 257 A.3d at 1053 (citing D.C. Code §16-4412 (a)(2)). Section 16-4412(a) requires an arbitrator to disclose "any facts that a reasonable person would consider likely to affect the impartiality of the arbitrator…."

In enunciating the standard, the statute provides two, non-exclusive, examples of what satisfies the standard. Paragraph (a)(2) expressly provides that a disclosure is required when an arbitrator has a "relationship with any of the parties…their representatives, [or] a witness…." *Id*. This obligation to disclose arises not merely at the inception of the arbitration, but continues for the duration of the arbitration's proceedings. *See* D.C. Code § 16-4412(b).

14

Thus, Judge Feeney was required to disclose her relationship with Judge Markell, a witness, when she agreed to work on the amicus brief in November 2025. She did not, and it was a per se violation of § 16-4412(a)(2).  Accordingly, this Honorable Court may, in its sound discretion, vacate the amended final award. *See* D.C. Code § 16-4412(d).

Within this context, Powell spends a substantial portion of their Petition/Opposition erroneously arguing that Dixon must prove actual bias, or arguing that the amicus brief was not related to the arbitration, and thus the relationship was not required to be disclosed. Powell's arguments miss the point. Instead, the express, unambiguous words of  § 16-4412 control and are satisfied.

The facts presented are not limited to a simple failure to disclose, however. Instead, the facts demonstrate that during the pendency of the arbitration and while many key rulings by her remained to be decided, Judge Feeney consciously chose to begin a relationship with Judge Markell by preparing and co-signing a December 10, 2025 amicus brief filed with the U.S. Supreme Court.

Upon learning of Judge Feeney's involvement, Judge Markell, as he had in April of 2025, approached Judge Feeney with concerns over even the appearance of impropriety. Doc. 5-3, pp. 16-17. Judge Markell harbored these concerns even though he believed that the arbitration was largely over, but, perhaps, still in the time period permitting Dixon to appeal. *Id.* His caution is striking when compared to the Judge Feeney's seeming lack of concern. Indeed, Judge Feeney apparently did nothing upon learning of Judge Markell's involvement or receiving his cautionary email.

She did not respond to Judge Markell, or if she did neither Judge Feeney, Judge Markell or Mr. Ito has produced that response. Neither did she disabuse Judge Markell of his belief that

337919383v.1

the arbitration was over, or tell him that she still had to rule, inter alia, on whether to award

Powell the costs of Judge Markell's expert fees. She did not withdraw from the amicus brief.

Similarly, Judge Feeney did not go to JAMS and request a supplemental conflict analysis.

Finally, and most significantly, she did not notify Dixon.

Moreover, the correspondence between Judge Feeney, Judge Markell and the attorney in

April of 2025, when viewed in context with her actions in November 2025, evince a conscious

disregard on Judge Feeney's part of requirement to disclose the amicus brief relationship. As is

borne out in her April 2025 emails, Judge Feeney knew, seven months before the amicus brief,

that she had to disclose her prior relationship with Judge Markell. *See* Ex. 3. She also knew that

she should make "a supplemental disclosure" for the contemplated seminar. The day after

making this admission, however, Judge Feeney decided against disclosing the potential

relationship, because in her words, she did not want to put pressure on the parties, and withdrew

from the follow up seminar. *Id*.

If, according to Judge Feeney, she had a duty to disclose the contemplated seminar, then

she most certainly knew seven months later in November of 2025 that she had to reveal the

amicus collaboration. Further, her decision not to disclose was not the product of a good faith

belief that she did not have to disclose; instead, it was her conscious decision not to reveal the

relationship, and continue on as arbitrator and work on the amicus brief without letting Dixon

know.

In her declaration, Judge Feeney offers no explanation or defense of her failure to

disclose. Doc. 5-3, pp. 175-178.Instead, she states that she did not learn of Judge Markell's

involvement until November 17, 2025, and thereafter she had limited contact with Judge Markell

16

involving the amicus brief. *Id*. In so doing, Judge Feeney neglects to reference Judge Markell's cautionary email to her. *Id*.

Contrary to Judge Feeney's and Powell's contention, however, it is the creation of the relationship, not the substance or involvement of the arbitrator and witness, that is the salient issue under Section 16-4412 (a)(2). It is not, as Judge Feeney and Powell contend the nature and substance of Judge Feeney's involvement with Judge Markell after the relationship is created. This is particularly true here because the relationship was not disclosed.

Powell's argument that a second disclosure for the relationship surrounding the amicus brief was not necessary because of the March 2025 disclosure, or that Dixon waived their objection, is incorrect. Judge Feeney had " a continuing obligation to disclose…after accepting [her] appointment" facts that a reasonable person would consider likely to affect the impartiality of the arbitrator." D.C. Code § 16-4412(b). Further, it takes a certain level of cheek for an attorney to argue that Dixon waived their statutory right to the disclosure, despite the fact that the attorney making that argument knew of the disclosable relationship, as Mr. Ito did in November of 2025, knew the arbitrator did not make the requisite disclosure, and, in turn, he failed to disclose the relationship or notify anyone that Judge Feeney did not make the disclosure.

Equally incredible is the fact that Judge Feeney and Mr. Ito appeared at the January 2, 2026 conference call, wherein Judge Feeney requested Mr. Ito provide her with more specific documentation and facts to support Powell's request including, inter alia, for Judge Markell's fees, and neither one of them disclosed the relationship to Dixon. As is set forth below, the excessiveness of Judge Feeney's attorney's fee and costs awards following Dixon's Motion to Disqualify, provide further evidence of Judge Feeney's evident partiality.

17

337919383v.1

These facts demonstrate that Judge Feeney, in November of 2025, made the conscious and knowing decision to proceed with the amicus brief work with Judge Markell, but not disclose that relationship to either Dixon or JAMS. Presumably she failed to make the disclosure because she knew Dixon and their legal counsel would have objected to the relationship, particularly given the rulings leading up to November. As such, Dixon respectfully request that the Court exercise its sound discretion and vacate the amended final award under Section 16-4412(d).

D.      Vacatur Is Appropriate Under Paragraph C.

While Judge Feeney never formally disclosed the relationship to Dixon, she did issue an unsworn declaration in response to Dixon's Motion to Disqualify. As such, Dixon respectfully requests that the Court vacate the amended award under paragraph (c) of §16-4412.

Dixon filed their Motion to Disqualify on January 6, 2026. Powell opposed and produced, previously undisclosed communications, between Judges Markell and Feeney.

In response, Judge Feeney issued a declaration. Doc. 5-3, pp. 175-178. JAMS did not produce the affidavit to Dixon. Indeed, Dixon did not become aware of Judge Feeney's statement until February 27, 2026, when JAMS denied the Motion to Disqualify.

In addition, JAMS referred the issue to Richard Chernik for evaluation of Dixon's Motion to Disqualify. Again, JAMS did not advise Dixon of Mr. Chernik's involvement.

On February 6, 2026, Mr. Chernik issued a two-page letter recommending that the Motion to Disqualify be denied because, according to him, "[t]here was no material contact between Feeney and Markell, and Feeney made robust disclosures about her relationship with Markell early in the case." Doc. 5-3, pp. 172-173. On February 27, 2026, JAMS adopted Mr. Chernik's recommendation and denied Dixon's Motion. Doc. 5-3, p. 171.

18

337919383v.1

First, the entire handling of the Motion to Disqualify lacked transparency. JAMS did not reveal who was reviewing Dixon's Motion until its February 27, 2027 determination letter. Prior to that letter, JAMS did not advise Dixon of Mr. Chernik's involvement. Neither did JAMS provide Judge Feeney's declaration to Dixon until after the decision.

Second, Mr. Chernik's analysis leading to his recommendation to deny the Motion to Disqualify, did not apply the Act and in so doing focused on alleged "robust disclosures…early in the case." The recommendation ignores that Judge Feeney had a continuing obligation to disclose both under the Act and JAMS' internal guidelines. Thus, Chernik's analysis was limited to the lack of material contact between the Judges. That is not the standard which triggers whether a disclosure is to be made or if a relationship and/or failure to disclose constitutes evident partiality.

For the same reasons, Powell's argument that the NAC's determination effectively resolves the issues presented by this Petition is not correct. The issue before this Court is not whether the NAC believed disqualification was warranted under JAMS' internal procedures. The issue is whether the award should be vacated under D.C. Code §§ 16-4412 & -4423. That determination rests with this Court alone.

The NAC proceeding also addressed a different question than the one now before the Court. The NAC considered whether Judge Feeney should be disqualified while the arbitration remained pending. This Court must determine whether the resulting Award should be vacated after considering the complete record, including the undisclosed amicus relationship, the post-award proceedings, and the Final and Amended Final Awards, along with any discovery in this proceeding, if authorized by the Court.

Powell also rely on the NAC's conclusion that the amicus relationship was insignificant and therefore did not warrant disqualification. Again, this is different from the standard of whether disclosure was required, and thus whether there was the appearance of impropriety.  But whether the relationship required disclosure is the very issue before this Court. Dixon respectfully disagree with the NAC's conclusion, and the Court is not bound by that determination. Whether the undisclosed relationship gives rise to evident partiality or otherwise warrants vacatur under the Act is a question for the Court to decide. *See e.g. Grunley*, at 1051.

Moreover, the NAC's determination relied on the declarations from the very individuals whose conduct was, and is, under scrutiny: Judge Feeney, Mr. Ito, Powell, and Judge Markell. Had the amicus relationship been disclosed when it arose in November 2025, Dixon could have sought to re-depose Judge Markell regarding the nature and scope of the collaboration, and would have had the opportunity to explore when and how both were selected for the brief and whether the relationship was more extensive than previously disclosed. Dixon was denied that opportunity.

Finally, the NAC decision does not change the prejudice resulting from the nondisclosure. Dixon were never given the opportunity to fully evaluate the relationship and raise the issue before Judge Feeney ruled on the remaining issues in the arbitration. Instead, Dixon was dependent upon Mr. Ito and Judge Feeney to provide documents and information they deemed relevant and supportive of their position. As courts have recognized, disclosure requirements exist precisely so that conflicts may be addressed during the arbitration process, rather than after an award has been entered. See *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 139 (2nd Cir. 2007). For these reasons, the NAC

337919383v.1

decision does not resolve the issues presented by the Petition and provides no basis for denying the relief requested herein.

The post-award fee proceedings also illustrate why the undisclosed relationship was relevant. Dixon vigorously opposed Powell's request for attorneys' fees, arguing that Powell improperly attempted to use a private 40% contingency fee agreement to support a fee-shifting award rather than applying the lodestar analysis required under Colorado law. Dixon further argued that Powell's calculation effectively applied the contingency percentage to both the underlying award and the fee award itself, resulting in a requested fee that substantially exceeded counsel's stated hourly rate.

Despite these objections, the Arbitrator awarded $554,000 (a 2.5 times enhancement over the base lodestar of $221,545) in a matter that involved standard motion practice and a single one day evidentiary hearing, without novel or complex issues that would warrant such an extraordinary multiplier. Ironically, Judge Feeney relied upon her egregiously excessive compensatory damage award to support the 2.5 enhancement. And most notably, the fee award included reimbursement of approximately $30,000 in expert fees payable to Judge Markell himself. Judge Feeney was thus ordering Dixon to pay the fees of the very expert with whom she had an undisclosed contemporaneous professional relationship. That alone demonstrates why disclosure of the relationship was necessary to avoid even the appearance of partiality.

## IV.   <u>CONCLUSION</u>

WHEREFORE, Petitioners Dixon Law, LLC and Eric Dixon respectfully request that this Court grant the First Amended Petition to Vacate Arbitration Award, vacate the Final Award and Amended Final Award, and grant such other and further relief as the Court deems just and proper.

337919383v.1

Dated:  June 16, 2026

Respectfully submitted,

/s/ Matthew W. Lee
Matthew W. Lee (D.C. Bar #460183)
WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP
8444 Westpark Drive, Suite 510
McLean, Virginia 22102
Telephone:  703-852-7788
Facsimile: 703-245-9301
Matthew.Lee@wilsonelser.com
*Attorneys for Petitioners Eric Dixon, Esq. and*
*Dixon Law, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16th day of June, 2026, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/ Matthew W. Lee
Matthew W. Lee (D.C. Bar #460183)
WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP
8444 Westpark Drive, Suite 510
McLean, Virginia 22102
Telephone:  703-852-7788
Facsimile: 703-245-9301
Matthew.Lee@wilsonelser.com
*Attorneys for Petitioners Eric Dixon, Esq. and*
*Dixon Law, LLC*

337919383v.1